**Gary JANSKI, Appellant (Defendant below),**

**v.**

**The STATE of Wyoming, Appellee (Plaintiff below).**

**No. 4348.**

Supreme Court of Wyoming.

July 23, 1975.

347.31(a)(ii), W.S.1957, as amended. The drug involved was hashish. During the State's case in chief, a Robert Laabs, with the nickname Haystack, undercover narcotics agent for the Casper police department, testified that after knowing the defendant for about a week, he went to his residence where defendant answered the door, let him in and together they went to the basement of the house, where Laabs asked him if he could buy some hash. Laabs testified that defendant told him he would have to go out to a golf course and get it from a friend of his. There were some teenagers present in the house at the time. After the defendant had been gone approximately 25 to 30 minutes, he returned with two tinfoil-wrapped packages, saying that they were quarter ounces. Laabs bought two of them at $40 each, for a total of $80. After remaining for another 15 or 20 minutes, talking to Janski and the other people in the house, he left and went to his police supervisor's residence where he delivered his purchase, as evidence.

On direct examination by the State prosecutor, Laabs admitted that several years previously he had been convicted of armed robberies when he was 17 and 18 years of age, been confined in a reformatory and had spent five years in a penitentiary. Following his release, he had gone into a business, found his way into the position of narcotics agent and had worked at that occupation in several different states. Previous to the trial, on a motion in limine by the State, defendant offered to show that the State's witness Laabs had been arrested for burglary and other offenses, too, but the court ruled that a witness may not, on cross-examination, be asked whether he had been accused of, arrested, indicted or tried for a crime of which he had not been convicted. At the same time, the trial judge also prohibited use of a Denver Post news article in cross-examination of Laabs.

During the course of his testimony, it developed that on occasions the witness

John E. Ackerman, Ronald L. Brown and Peter J. Feeney, Casper, for appellant.

David B. Kennedy, Atty. Gen.,* and David A. Kern, Asst. Atty. Gen., Cheyenne, for appellee.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

RAPER, Justice.

Following reversal of the trial court (529 P.2d 201), upon application of the State, a rehearing was granted in this case. It was thereafter argued anew and taken under advisement by the full court. We now set aside the original opinion as improvident and affirm. It is considered advisable to make a complete restatement of the facts in the case to cover the several points raised by the appellant.

The defendant-appellant was charged with delivering a controlled substance in violation of § 35–347.14(d)(10) and § 35–

---

* Term expired prior to oral argument.

Laabs, while acting as an undercover agent, would disguise himself with a Mohican haircut and he said, "[T]he weirder, more I look crazy looking, the more dope I usually buy." While working for the police department, the witness had bought a couple thousand dollars worth of drugs in this role.

The following exchange took place on cross-examination:

"Q. Do you know whether he [defendant] made any profit on the sale or not?

"A. I believe he did.

"Q. You don't know though, do you, you don't know how much he paid.

"A. Well, there were other boys there buying it also."

The drug was properly linked into a full chain of evidence and the State chemist identified it to be a controlled substance, a derivative of marijuana. The State thereupon rested.

There was an additional charge of the same sort pending against the defendant. It was scheduled to be tried immediately following this one. Since they involved many similarities, one witness mistakenly testified the transaction took place on January 7 when, in fact, it took place on January 6. Defendant at close of State's case in chief asked for a mistrial, which the trial court denied, and the State was permitted to reopen to straighten out the dates and the defendant was offered an opportunity by the State for a continuance if defendant was unprepared to meet the State's evidence, which he did not take nor request but proceeded into his defense to the evidence presented.

The defendant established through a city official that the witness Laabs had been employed as an emergency employee and at the time of his employment, it was known that he had a felony record. At every chance, it might be said, defendant played Laabs' felony convictions to the limit for the benefit of the jury. On direct examination, witness Laabs was called by the de-fendant and asked whether he carried a gun with him during the time that he was an undercover agent. The witness answered that he carried a .22 derringer, black with a pearl handle. He was asked whether or not he stuck the gun into defendant's stomach. Laabs denied that he did so.

A witness, Kevin Doing, age 17, was called by the defendant. He testified that Haystack Laabs was discussing drugs in Janski's basement "and he stood up and gave Gary some money and told him to go get the hash and bring it right back here, he said, don't mess around with Haystack. He had a gun and pushed it into Gary's stomach." Doing described the gun as a "gray Derringer type pistol, .22, with a white handle." On cross-examination, Doing said that the gun used had a cylinder and he could see the bullets showing out of the front. On further cross-examination, the prosecutor showed the witness a derringer, regularly marked as an exhibit, and he replied, "[T]his isn't the gun I saw, the gun had a cylinder right here (indicating), it had a shorter barrel, the cylinder right here, light gray handle." He was definite that the weapon used by Laabs had a cylinder. The hand gun displayed to the witness had no cylinder.

Laabs was recalled on State's rebuttal, handed the same derringer as the one shown to Doing. He identified it as the weapon carried while he was on duty. He also testified that on a day about a week later, he did carry a .38 revolver. Laabs' supervisor was then called and he testified that on only one occasion had Laabs had possession of a police .38 revolver and it was at a time a week later than the date of the offense being tried. The State had neglected to offer the derringer as an exhibit and upon all the evidence being closed, reopened momentarily, with permission of the court, to do so. It had been marked and shown to both Doing and Laabs, so was no more than a technical correction.

At the close of the State's rebuttal, the defendant requested an opportunity for surrebuttal and offered to prove by em-

ployees of a Casper Mini-Mart that Laabs had threatened one of them with a revolver. The offer was denied. Later in the opinion, these proceedings will be explained in greater detail.

Following instructions and argument, the jury retired and returned a verdict of guilty. The defendant was sentenced to the Wyoming state penitentiary for a term and fined $500.00.

The defendant assigns as error the following:

1. Refusal of the court to permit the defendant an opportunity to inquire of the State's undercover narcotics agent as to his previous criminal activity, not resulting in convictions, in the light of the witness' rather extensive record of felony convictions.

2. The evidence adduced at trial was insufficient to overcome the defense of entrapment, thereby rendering the verdict contrary to the evidence.

3. The court's submittal of the issue of entrapment to the jury.

4. The court's allowing the trial to proceed after the court discovered that evidence had been received concerning the crime for which the defendant had not been convicted and was not then being tried.

5. The court's denial of surrebuttal by defendant.

The trial court was correct in limiting the cross-examination with respect to any past offenses of Laabs to felonies of which he had been convicted, for purposes of impeachment. The rule, under the facts of this case, is that only evidence of a prior conviction for a felony is admissible to impeach a witness. *Gabrielson v. State,* Wyo.1973, 510 P.2d 534, 536; *Wright v. State,* Wyo.1970, 466 P.2d 1014, 1016; *Rosencrance v. State,* 1925, 33 Wyo. 360, 373, 239 P. 952, 956; *Eads v. State,* 1909, 17 Wyo. 490, 503, 101 P. 946, 950.[1]

The court instructed the jury that when the defense of entrapment is claimed, it is necessary that the State show a predisposition by the defendant to commit the crime.[2]

1. For an interesting discussion of the rule, see McCormick et al. on Evidence, 2d Ed., HB, § 43, beginning on page 84.

2. Instruction No. 7 in its entirety is as follows:

"Defendant claims the defense of entrapment.

"Broadly speaking, the defense of entrapment is accorded to a defendant by law, in order to prohibit law enforcement officers from instigating criminal acts by persons otherwise innocent, in order to lure them to commit the crime, and then to punish them.

"If a person has no previous intent or purpose to commit the crime charged, but is induced or persuaded by law enforcement agency to commit the crime, he is a victim of entrapment.

"A defendant who has been entrapped, although otherwise guilty in all respects, must be acquitted of the crime committed as a result of the entrapment.

"To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent, and the trap for the unwary whose criminal conduct was due to his own readiness and who himself planned to commit the crime.

"Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police. The fact that officers or employees of the government merely afford opportunities, or some of the means or facilities for the commission of the offense, does not defeat the prosecution. Nor will the mere fact of deceit. Infiltration and limited participation by a police employee in unlawful practices, to gain the confidences of wrongdoers, is a recognized and permissible means of apprehension. It is only when the government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment is available.

"With the foregoing introduction, you are then specifically instructed:

"The principal element in the defense of entrapment is the presence, or absence, of the defendant's predisposition to commit the crime.

"If you conclude there is reasonable doubt whether any defendant had the previous intent or purpose to commit the offense in his case, and that he committed or participated in the offense only because he was induced or persuaded to do so by the police employee and police activity, then you must acquit that defendant.

"But, where a person has a predisposition, the willingness and the readiness to commit

The defendant argues that there was no evidence of predisposition.

■ Without getting into the details of the trilogy [3] of cases of the Supreme Court of the United States on entrapment, we find a good synopsis of the rules to be gleaned therefrom in Anno., Entrapment—Narcotics Offense, 33 A.L.R.2d 886, § 3:

"The cases within the scope of the annotation support the conclusion that the defense of entrapment cannot be successfully interposed by one accused of a narcotics offense if he was already engaged in an existing course of similar crimes,[4] *or* if he had already formed a design to commit the crime with which he was charged, or similar crimes, as where he offered to make a sale prior to any solicitation, *or* was willing to do so, as shown by ready complaisance, *or* if the criminal design originated in the mind of the defendant, and the government, having through its agents reasonable cause to believe that the defendant was violating the narcotics laws, merely afforded opportunities or facilities for the commission of the offense, as by the employment of informers or decoys, the use of decoy letters, or other stratagems. * * *" (Emphasis and footnote supplied.)

It will be observed that there are various alternative ways of establishing predisposition and may be shown by a fashioning of circumstances preceding the sale in which the defendant committed the offense. The facts in this case are very simple and fall within the rule of ready complaisance. They show that Laabs went to the defendant's residence, asked to buy drugs, the defendant went to his known source, was gone a few minutes and returned. His plan and design to sell became fixed with those preliminaries and were confirmed when the sale was made. From these facts, there is the requisite evidence of predisposition and that is what the cases hold.

As early as *State v. Kirkbride,* 1925, 34 Wyo. 98, 100, 241 P. 709, 710, this court recognized that:

" * * * The decisions in cases involving illegal sales of drugs and liquors are practically unanimous in holding that the defense of entrapment is not available where the only solicitation is an offer to buy. * * *"

When the jury discarded defendant's defense of threat with a hand gun, by its guilty verdict, that is all that was left and the State had carried its burden of proving predisposition. A review of some cases out of the United States Court of Appeals, Tenth Circuit, follows.

In *Sandoval v. United States,* 10 Cir. 1960, 285 F.2d 605, 607, a case similar to

the crime, the mere fact that the police and the police employee provide what appears to be a favorable opportunity to do so, is not entrapment."

3. *United States v. Russell,* 1973, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366; *Sherman v. United States,* 1958, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848; *Sorrells v. United States,* 1932, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, 86 A.L.R. 249.

4. There are lurking dangers involved to the prosecution when it evidentially explores the drug peddling background of a defendant charged with delivery of a controlled substance. See, for example, *Hansford v. United States,* 1962, 112 U.S.App.D.C. 359, 303 F.2d 219, where the defendant raised the defense of entrapment and the State came back to prove his criminal record to show a pre-disposition to commit the instant offense. It was found to be reversible error by the court because as it said at page 225:

"There is a well settled rule that it is ordinarily reversible error for the trial court to admit evidence of an offense other than the one on trial. * * *"

and went on to say at page 226:

" * * * There was no arrest for the alleged prior offense and thus no indictment or conviction. In these circumstances the defendant had no opportunity to prepare to defend against this other charge and no means of combatting it, save by his own unsupported testimony in denial of the officer's testimony. * * *"

We here confine our holding to the facts of this case and set no standards for other means by which the entrapment defense may be met.

this, the government agent approached the defendant, asked him if he had any heroin, he replied that he had only five caps, for which the agent paid him $35.00, the court stated:

" * * * It is well settled that while the law will not permit decoys to be used for the purpose of luring or inducing innocent or law-abiding citizens into the commission of a crime, still officers may offer an opportunity to one who is intending or willing to commit a crime. [Citing cases.] It is quite clear that Sandoval was not entrapped into making the sale to Chavez. The evidence is without conflict that he approached the car driven by Chavez and, when he recognized him, entered the automobile with the narcotics in his possession. He had known Chavez for a long time, and he made the sale without asking any questions, immediately after Chavez asked him if he had any heroin. He was ready, willing and able to make the sale when he entered the automobile."

The same situation existed in *Wood v. United States,* 10 Cir. 1963, 317 F.2d 736, 738, where the agent told the defendant he wanted some narcotics and they were sold to him. The court said:

" * * * These facts are again undisputed and bring the case well within the creation of a simple opportunity to commit a crime as described in *Hester v. United States,* 303 F.2d 47 (10th) Cir., * * *."

In *Hester v. United States,* 10 Cir. 1962, 303 F.2d 47, 49, cert. den. 371 U.S. 847, 83 S.Ct. 80, 9 L.Ed.2d 82, the "special employee" testified:

" 'I told him (appellant) that I would like to purchase some narcotics, and he said he thought it was possible, and I purchased three capsules of heroin from him.'

"Appellant did not testify and the informer's version of the purchase remained totally uncontradicted.

"We find no merit to the contention that the issue of entrapment rests against this background of events. Rather the circumstances point directly to the establishment of a simple opportunity to commit crime with the appellant subjectively mistaking the safety of the circumstances. This is not entrapment. * * *"

In *Marshall v. United States,* 10 Cir. 1961, 293 F.2d 561, cert. den. 368 U.S. 898, 82 S.Ct. 175, 7 L.Ed.2d 94, reh. den. 368 U.S. 949, 82 S.Ct. 387, 7 L.Ed.2d 345, the defendant sought to have entrapment established as a matter of law, when the agent approached the defendant, asked to buy some amphetamines and they were sold. That court concluded such evidence did not establish entrapment as a matter of law and the issue having been submitted to the jury upon appropriate instructions, there was no entrapment.

The cases are so voluminous on the point that it is really unnecessary to go any further.[5] However, we are particularly impressed by *United States v. Rodrigues,* 1 Cir. 1970, 433 F.2d 760, 762, cert. den. 401 U.S. 943, 91 S.Ct. 950, 28 L.Ed.2d 224. It was also a simple case of solicitation and sale. Nothing more. The court said:

"It is true that the government did not produce evidence of appellant's prior connection with the narcotics trade. Although such evidence is admissible to rebut a proferred defense of entrapment, it is not the only means available to the government to meet its burden. A jury can find predisposition beyond a reasonable doubt by looking to the totality of circumstances involved in the particular transactions in question. Otherwise, a first offender, disposed to commit the crime for which he is charged, would

5. See the collection of cases in Anno., Entrapment To Commit Narcotics Offense, 62 A.L.R. 3d 110, § 4, and Anno., Modern Status of the Law Concerning Entrapment to Commit Narcotic Offense—Federal Cases, 22 A.L.R. Fed. 731, 739, § 4.

find sanctuary in the entrapment defense merely because the government would be unable to prove prior nonexistent activities. The entrapment defense does not require such a result. * * * "

■ The facts as submitted by the State's case in chief fulfilled the requirements of proof of predisposition. The jury chose to accept the State's evidence and reject the defendant's testimony of coercion with a firearm. A jury question was presented by the evidence. It was up to the jury to believe or disbelieve Laabs, in spite of his past felony record. Though the appellant-defendant makes much of this fact, it is not for this court to judge the testimony in the case, where there is a conflict and to do so would usurp the function and authority of the jury. We have no right to say that a particular person or type of individual with a felony conviction, cannot be a witness, which is what we would be doing if we set aside Laabs' testimony. If he was acceptable to the jury, he was acceptable to the community, which the jury represents and this court when we must permit the jury to be supreme in its domain of fact finding.[6] The defense of entrapment was not established as a matter of law. The crucial question is for the jury when there is a conflict of evidence. *LaFleur v. State,* Wyo.1975, 533 P.2d 309, 314; *Dycus v. State,* Wyo.1974, 529 P.2d 979, 981; *Montez v. State,* Wyo.1974, 527 P.2d 1330, 1332; *Higby v. State,* Wyo. 1971, 485 P.2d 380; *State v. Kirkbride, supra.*

■ While there was some confusion as to which case was being tried, there is no indication that the jury received any prejudicial evidence or implications, because the transcript indicates that the matter of confusion if in fact it did exist, was presented to the court alone and outside the hearing of the jury; from what we can see in the transcript, the jury could have been completely oblivious to any mixup. It is apparent that the defendant was prepared to go ahead with his defense and had his witness, Doing, present along with other witnesses. The defendant was entitled to a fair trial but not necessarily a perfect one.

Turning now to the question relating to the additional evidence offered by the defendant as surrebuttal, we think the matter has been settled by a statute of the State of Wyoming and case law as well. The defendant was not entitled to surrebuttal, as a matter of right.

After both parties had rested their cases at the day's end, defendant moved to be allowed to reopen testimony and stated as a reason that as a result of the .22 derringer being admitted into evidence on the State's reopening, he now had something to rebut. The trial judge agreed to allow the defendant to reopen briefly. However, the next morning, after some reflection, the court asked defense counsel to dictate his request into the record. Defendant then in greater detail repeated his motion for surrebuttal to show through two witnesses from a Casper Mini-Mart that they had seen the witness Laabs on a number of occasions with a .38 caliber revolver and he had threatened one of the proposed witnesses for being a "snitch" because he had called the police when Laabs tried to sell him some drugs and he refused. Further-

6. We must lay aside any individual attitudes about Mr. Laabs in dealing with the issues of law. In the recent case *United States v. Russell, supra,* Mr. Justice Rehnquist, speaking for the majority of the United States Supreme Court, said at 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366, 375:
"Several decisions of the United States district courts and courts of appeals have undoubtedly gone beyond this Court's opinions in Sorrells and Sherman in order to bar prosecutions because of what they thought to be, for want of a better term, 'overzealous law enforcement.' But the defense of entrapment enunciated in those opinions was not intended to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve. The execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations. * * * "

more, another witness would testify that Laabs had threatened two friends of hers with a gun and ordered them out of Casper and told them if they came to Casper, they would be arrested for selling narcotics.

The foregoing offer was claimed to be newly discovered evidence but during the taking of testimony at the trial, some of these circumstances were hinted at by defendant, naming at least one of the proposed witnesses. After questioning of counsel closely and explaining his position,[7] the trial judge denied the request for surrebuttal.

■ Section 7–228, W.S.1957, prescribes the order in which criminal trials shall proceed and, in part, states:

"\* \* \*

"Fourth—The state will then be confined to rebutting evidence, unless the court, for good reasons, in furtherance of jus-

tice, shall permit it to offer evidence in chief;[8] .

\* \* \*"

(Footnote supplied.)

Whether or not the person engaged to buy narcotics for the State had a weapon was no part of the State's case in chief. The defendant by way of a defense opened the subject of the witness Laabs shoving a weapon into the stomach of the defendant, to persuade him to sell narcotics. The State is normally entitled to open and close the evidence. Introduction of the .22 caliber derringer into evidence was not new evidence in the sense that it would be a part of the State's case in chief. The matter of getting the derringer into evidence before it concluded its rebuttal was only an oversight on the part of the prosecution. It had already been produced and shown not only to defendant's witness Doing but also to the witness Laabs during the course of his testimony when he had been called

---

7. "I think these are collateral matters, the only issue involved in the testimony was raised by the defense witness as to seeing the pistol, which he identified as a revolver pointed at the Defendant. The rest of these matters are proposed by Mr. Whitaker appear to the Court to be collateral matters, not related to the issues at the trial, with the possible exception of the disposition of the State's witness Laabs. If the Defendant had stated to the Court that he desired to hold the trial open, which he had an opportunity to do, it might have a different situation. I recall that Mr. Whitaker had said he was trying to locate a couple of witnesses, but hadn't been able to find them, and we then proceeded with the closing on both sides. I think we should proceed with the trial, after the closing by both sides, and the Instructions, and Mr. Whitaker's request will be denied."

8. The full statutory provison is as follows:
"After the jury has been impaneled and sworn, the trial shall proceed in the following order:
"First—The counsel for the state must state the case of the prosecution, and may briefly state the evidence by which he expects to sustain it;
"Second—The defendant or his counsel may then state his defense and may briefly state the evidence he expects to offer in support of it, or may wait until the evidence on the part of the state is closed;
"Third—The state must first produce its

evidence; the defendant will then produce his evidence;
"Fourth—The state will then be confined to rebutting evidence unless the court, for good reasons, in furtherance of justice, shall permit it to offer evidence in chief;
"Fifth—When the evidence is concluded, either party may request instructions to the jury on the points of law, which shall be given or refused by the court; which instructions shall be reduced to writing, if either party require it;
"Sixth—Before the argument of the case is begun, the court shall immediately, and before proceeding with other business, charge the jury, which charge shall be reduced to writing by the court, if either party request it, and such charge or charges, or any other charge or instruction provided for in this section, when so written or given, shall in no case be orally qualified, modified, or in any manner explained to the jury by the court, and all written charges and instructions, shall be taken by the jury in their retirement and returned with their verdict into court, and shall remain on file with the papers of the case;
"Seventh—When the evidence is concluded, and the charge given by the court, unless the case is submitted without argument, the counsel for the state shall commence, the defendant or his counsel follow, and the counsel for the state shall conclude the argument to the jury."

as a witness for the defense and was fully before the jury anyway. At that time, when he was testifying upon call of the defendant, Laabs stated that he had never pointed a gun at anybody and told them that they had to sell drugs and specifically denied pointing the gun at Janski.

It was during the defendant's case that Kevin Doing was called back for cross-examination. It was then that the weapon was handed to Kevin Doing and he was asked about it and he said that was not the gun and that the weapon used had a shorter barrel and a cylinder. The weapon being completely before the jury, it was only a small detail to offer and have it received in evidence. The event of its formally becoming a part of the record is but a frail ground for surrebuttal. The defendant had his opportunity to attack the credibility of the witness Laabs during his own case and passed it up.

■ As said in *State v. Alexander*, 1958, 78 Wyo. 324, 347, 324 P.2d 831, 839, cert. den. 363 U.S. 850, 80 S.Ct. 1630, 4 L. Ed.2d 1733, in dealing with the denial of surrebuttal:

"* * * While it is true, as explained by Wigmore, supra, § 1874, pp. 517–518, and 1 Chamberlayne, The Modern Law of Evidence, § 383, pp. 516–517, that new facts brought out on rebuttal may properly be met by surrebuttal evidence, that rule does not permit surrebuttal merely to supply evidence which could have been given in chief or to cumulate additional evidence or to fortify evidence already given, or to supplement such evidence because it has been impeached upon rebuttal. * * *"

A word of caution in reading Wigmore, as cited in *State v. Alexander:* the cases cited in footnote 2 at page 518 in support of the rule deal with cases in which the State put in new facts in its rebuttal which were properly a part of its case in chief! In the instance here, the gun bit in rebuttal was no part of the State's case but only

designed to meet defendant's defense. Neither of the State's rebuttal witnesses were new witnesses, they had been called by the defendant himself, during his case; they could have then been impeached by the surrebuttal witnesses proposed during defendant's case and as a matter of fact were called by defendant to lay the ground work for that purpose. It was discretionary with the court as to whether to allow surrebuttal and as mentioned in *Alexander*, quoting Wigmore from page 517:

"'In general, such discretionary variations should be liberally dealt with; for nothing can be more irrational or more unjust than to apply the judicial lash of a new trial to errors of trivial importance.'"

See also *Keffer v. State*, 1903, 12 Wyo. 49, 73 P. 556, where surrebuttal was denied when the court decided that rebuttal testimony by the State was not a necessary part of the State's case in chief.

We find no prejudicial error by the trial court.

Affirmed.

McCLINTOCK, Justice (concurring in the affirmance of the conviction).

The case was submitted to the jury upon the question whether a "predisposition" of defendant to commit the crime had been shown. I am not sure that the use of this word is fortunate but it is frequently found in the opinions and no objection thereto was made by either party. The dispute between those justices of this Court voting for affirmance and those who would reverse appears to me to center around the question whether the evidence sustains a finding that defendant was so predisposed. As I interpret our earlier opinion in this case,[1] concurred in by me without comment, it holds that there was no evidence in the record to show such predisposition. I am not sure as to what then Justice McEwan's view on the exact question was but I, at least, was of the view that there

1. *Janski v. State*, Wyo., 529 P.2d 201 (1974).

had to be evidence relating to acts of the defendant other than the particular act for which the prosecution was commenced. I have withdrawn from this position and voted for rehearing because I believe that predisposition to commit the crime—as distinguished from the exercise of improper influence upon a weak but basically innocent character—can be found by the jury from the facts and circumstances relating to the commission of the alleged criminal act.

I understand the earlier cases to hold that once the defendant has proved inducement the burden then rests with the State to prove a valid excuse therefor. However, I think the better analysis of the evidentiary burden is set forth in opinions of the Court of Appeals for the Fifth Circuit. In *Kadis v. United States,* 373 F.2d 370, 374 (5 Cir. 1967), after indicating that that court would no longer consider the question of inducement as a separate issue, the court says:

> " * * * Henceforth we will look, singly, at the ultimate question of entrapment. If the defendant shows, through government witnesses or otherwise, some indication that a government agent corrupted him, the burden of disproving entrapment will be on the government; but such a showing is not made simply by evidence of solicitation. There must be some evidence tending to show unreadiness. See *United States v. Riley, supra,* n. 4 [363 F.2d 955 (2 Cir. 1966)]."

Applying this burden of proof to the facts of this case, I think that the record sustains the conclusion that there was more than mere solicitation. There was evidence of a threat by a show of force, namely, the display of a gun with the statement, as testified to by the witness Doing, "don't mess around with Haystack." The testimony of Laabs, however, was to the effect that he merely asked for the drug, the defendant said he would have to go out to get it, did go out, and returned some 25 to 30 minutes later with two quarter ounces of hashish

which were then delivered to him upon payment.

To me this conduct is evidence of "ready compliance" as recognized by decisions going back to Judge Learned Hand's statement in *United States v. Becker,* 62 F.2d 1007, 1008 (2 Cir. 1933), and reiterated by him in *United States v. Sherman,* 200 F.2d 880, 882 (1952). As summarized in the annotation in 33 A.L.R.2d 883, 886, there are several excuses which can be shown to counter the defense of entrapment. One, but only one, of these is to show that defendant has already engaged in an existing course of similar crimes, and other excuses are enumerated in the annotation as alternatives. The fourth one so listed is by showing that the defendant was willing to make the sale and readily complied with the police request, referred to as "ready compliance." I find nothing in any of the cases or this annotation that indicates that predisposition can be established *only* by a course of criminal conduct or engagement in similar activity so frequently that his participation in this particular event can be said to be part of a criminal pattern. Conceding that such evidence might be more persuasive to the trier of the fact, I am of the opinion that a man who promptly complies with a request to sell drugs may be said to have shown ready compliance. The jury would be entitled to find willingness to make the sale from the fact that defendant was able quickly to contact a source of the drug, make arrangements for payment therefor, secure delivery, and complete the transaction with Laabs in a half hour. His claim of threat could be rejected as implausible since it would have been equally easy for him to contact the police and advise them of this threat. To me there was a factual question for the jury as to whether defendant's conduct, viewed in the totality of the circumstances, indicated willingness and ready compliance.

I think that *United States v. Rodrigues,* 433 F.2d 760, 761–762 (5 Cir. 1970), cited in the majority opinion, is most pertinent,

and would only add the following additional quotation as illustrative of my view:

"The appellant's version of the facts demonstrated little more than mere solicitation. A jury would of course be entitled to believe the government's version of what occurred, that three simple requests for drugs, without censurable pressure of any sort, led to immediate affirmative responses on the part of the appellant and subsequent sales of heroin. The sole discussions, in the government's version, were of price, quantities, and a statement by appellant relating to a New York source of supply. In any event, whether or not the jury, if asked, would have found that defendant had met his burden of showing something more than mere solicitation, it found that the government had met its burden of disproving entrapment. The evidence, unlike the undisputed testimony in *Sherman v. United States,* 356 U.S. 369, 373, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), presented a jury question. * * *"

In my opinion a question of fact was created by the evidence in this case and the jury has determined that question adversely to the defendant. I am therefore of the opinion that any burden of proof resting upon the State has been sustained and the conviction should be affirmed.

ROSE, Justice, (dissenting).

This matter comes to us upon the State of Wyoming's application for a rehearing from our decision in *Janski v. State,* Wyo., 529 P.2d 201.

It is alleged in the application that:

". . . . this Court made an erroneous conclusion from the Record and Briefs of counsel that there was insufficient evidence to enable the jurors to conclude that the Defendant was *predisposed*[1] to commit the crime." [Emphasis mine]

The State says that there was "predisposition" to commit the crime in the mind of Janski at the moment of inducement and therefore no entrapment took place, while we held in the original decision that Janski had been trapped. This former holding is now overruled by the majority opinion here.

The petition was allowed, however, with the provision that all issues originally raised by the appellant would be reviewed. Only the question of entrapment was considered in the original opinion.

ENTRAPMENT

The appellant frames the entrapment issues as follows:

"The evidence adduced at trial was insufficient to overcome the defense of entrapment thereby rendering the verdict contrary to the evidence." and "The Court erred in submitting the issue of entrapment to the jury."

I will consider these two related points together.

This appeal tells a story of the techniques being employed by law-enforcement officials in Casper and, perhaps, other parts of Wyoming in the mid-1970s in their effort to control the drug problem. It calls into focus the practice of employing a many-times-convicted criminal as an undercover agent and entrusting him with the kind of responsibility for integrity that has long been requisite to a good law-enforcement official's character.

On the 6th day of January, 1973, Gary Janski, a young man in his very early twenties, lived at Casper, Wyoming. Laabs was what he and the Casper Police Department called an "undercover agent" and his nickname was "Haystack." Haystack arrived at the Janski residence about 1:00 p. m. on the 6th day of January, 1973. Janski answered the door and together they went down into the basement whereupon Haystack asked Janski if he could

[1] I emphasize "predisposed" because it is in this word, or modulations of it, that my dissent is anchored on the question of entrapment.

buy some hashish. Janski told him that he would have to go out to a golf course somewhere and get it from a friend. Thereupon Janski left for about 25 to 30 minutes and was observed by Laabs going toward the golf course. Janski returned with two tinfoil-wrapped packages, representing to Laabs that they were quarter ounces of hashish and Laabs testified that he bought them for $80.

Kevin Doing, age 17, testified that he was present when the request was made of Janski and at that time Laabs had a gun pushed into Janski's stomach and said "Don't mess around with Haystack." Doing said that the money was given by Laabs to Janski before Janski went for the hash, while Laabs said that he paid the money after he received it. Also, Laabs denied using a gun.

The Doing testimony as to the use of the gun was determined adversely to the position of the accused by the jury and is accepted by me in that light. I therefore do not regard it in any sense as being favorable to the defendant on the question of entrapment.

The above represents the sum and substance of the entrapment testimony in this case.

This court has worried in other cases about criminal prosecutions that have been laid out by the police. Justice McClintock spoke for the court in *LaFleur v. The State of Wyoming*, Wyo., 533 P.2d 309, 312–313, decided April 1, 1975, when he said:

> "Condemnation of prosecution of crimes which have been arranged by law enforcement officers is of long standing. Thus, in *Saunders v. People*, 38 Mich. 218, 222 (1878) Mr. Justice Marston said in his concurring opinion that courts '* * * have not yet gone so far, and I trust never will, as to lend aid or encouragement to officers who may, under a mistaken sense of duty, encourage and assist parties to commit crime, in order that they may arrest and have them punished for so doing.'

"The cited federal decisions are equally strong in their condemnation of manufacturing cases, the summation on that appearing in *United States v. Russell, supra* note 8, 411 U.S. at 434, 93 S.Ct. at 1644, where Mr. Justice Rehnquist, speaking for the majority, states: '* * * We are content to leave the matter where it was left by the Court in *Sherman:* "The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, 'A different question is presented when the criminal design originates with the officials of the Government, and the implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.'" *Id.* at 372 [78 S.Ct. 819] quoting *Sorrells v. United States, 287 U.S., at 442 [53 S.Ct. 210].

The United States Supreme Court has commented upon the activities of undercover agents in entrapment cases such as this. In *Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 212, 77 L.Ed 434 (1932), the undercover agent asked the accused to get him some liquor (during prohibition), during their conversation about their war experiences. The Court said:

> "It is clear that the evidence was sufficient to warrant a finding that the act for which defendant was prosecuted was instigated by the prohibition agent, that it was the creature of his purpose, that defendant had no previous disposition to commit it . . . . , and that the agent lured defendant, otherwise innocent, to its commission . . . .. Such a gross abuse of authority given for the purpose of detecting and punishing crime, and not for the making of criminals, deserves the severest condemnation, . . . . ."

In speaking to the question of entrapment and undercover agents, the United States Supreme Court in the *Sorrells* case, quoted Circuit Judge Sanborn in *Butts v. United States* (C.C.A. 8th) 273 F. 35, 18 A.L.R. 143:

" 'The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it. Here the evidence strongly tends to prove, if it does not conclusively do so, that their first and chief endeavor was to cause, to create, crime in order to punish it, and it is unconscionable, contrary to public policy, and to the established law of the land to punish a man for the commission of an offense of the like of which he had never been guilty, either in thought or in deed, and evidently never would have been guilty of if the officers of the law had not inspired, incited, persuaded, and lured him to attempt to commit it.' "

The precise question raised by the petition for rehearing is whether we erred in our original decision, as appellee-applicant urges and as the majority now holds, when we decided that there was insufficient evidence in the record to have warranted a jury finding the Janski was (when induced) "predisposed to commit the crime." The court said there was no evidence of predisposition—appellee-applicant says that there was, and makes the following statement at page 2 of its brief in support of its application for rehearing:

"The point that the Appellee has attempted to make with the Court was that when a Defendant comes forward and tells the agent that he will go and get the agent some hashish when the agent asked that Defendant if he knew where the agent could get some hashish, then certainly that Defendant has proved his *readiness* to commit *the crime, which is the same as saying he had exhibited his 'predisposition'."* [Emphasis mine]

The majority now, in reversing *Janski v. State*, Wyo., 529 P.2d 201, also finds evidence of predisposition.[2]

### *"Criminal Design," "Plan," "Predisposition," "Readiness"*

According to the record in this case, it stands without dispute that the implant of the criminal design in the mind of Janski was not his. It was impressed there by Haystack-Laabs. It was, however, the Government's burden to show that the criminal design had its origin with Janski before the State could overcome the defense of entrapment and thereby create a jury issue.

It is the accused's duty to prove inducement. It is the State's duty to overcome this by proving a criminal design—a predisposition to commit the crime—*a plan,* if you will,—and further that the accused was:

" * * * awaiting any propitious opportunity to commit the offense." *United States v. Sherman,* 200 F.2d 880, 882.

If this proof does not come into the record, the defense of entrapment, inducement having been proved, stands unassailed and there is, then, no issue for the fact finder.

It was said in *Sorrells,* supra:

" 'When the criminal design originates, not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion, deceitful representation, or inducement lured into the commission of the criminal act, the

2. Mr. Justice Raper says, in writing for the majority of the court: "It will be observed that there are various alternative ways of establishing predisposition and may be shown by a fashioning of circumstances preceding the sale in which the defendant committed the offense. The facts in this case are very simple and fall within the rule of ready complaisance. They show that Laabs went to the defendant's residence, asked to buy drugs, the defendant went to his known source, was gone a few minutes and returned. His plan and design to sell became fixed with those preliminaries and were confirmed when the sale was made. From these facts, there is the requisite evidence of predisposition and that is what the cases hold."

government is estopped by sound public policy from prosecution therefor.' " (From *Newman v. United States,* (CCA 4th) 399 F.2d 128, 131)

This concept was recognized in *Montez v. State,* Wyo., 527 P.2d 1330, 1332 (November, 1974), where then Chief Justice Parker, speaking for the entire court, said:

"If the defendant's testimony had been found by the jury to be true, that is, that he had not been connected with drugs and the drug business previously and if Quarberg (the Attorney General's agent) or Cullen (a woman that was involved in all of the transactions with Quarberg) *had implanted in the mind of an innocent person the disposition to commit the offenses and had induced the commission the jury would have been obliged to acquit on the ground of entrapment."* [Parenthetical information and italics mine]

There is no evidence in the record that, prior to the trap, there was in the mind of Janski any "criminal design," "plan to commit the crime," "predisposition" to do it, or any "readiness" on his part.

In *Higby v. State,* Wyo., 485 P.2d 380, 384, we said:

"Entrapment does not arise where one is *ready to commit the offense,* given but the opportunity, and suspected persons can be tested by being offered an opportunity to transgress the law although they may not be put under any extraordinary temptation or inducement." [Emphasis mine]

That rule is in support of what I say here because it reiterates again that there must be a "readiness"—a "criminal design"—a "predisposition" existing in the mind of the accused and, therefore, the offering of the opportunity to transgress the law is only one way of testing and probing to discover if the design is present.

The rule does not say that every time an opportunity to break the law is made available to the accused and he acts upon it, his action becomes irrebuttable proof of a preexisting "criminal design"—"readiness" or an already-formulated plan. If that were so every transgression would be its own proof of preconceived evil lurking deep in the estuaries of the defendant's soul and the concept of "preexisting criminal design" would be words without substance.

Furthermore, it is important to notice that *Dycus v. State,* Wyo., 529 P.2d 979, 980–981, goes on to reinforce the above analysis when the court says:

"We . . . . *agree with the pronouncements in Sherman,* 356 U.S. at 372, 78 S.Ct. at 821, *that 'Entrapment occurs only when the criminal conduct was "the product of the creative activity" of law-enforcement officials.'* It is, of course, conceivable that evidence be so clear and undisputed that entrapment could be decreed by a court as a matter of law. . . . *Sorrells v. United States, supra,* 287 U.S. at 452, 53 S.Ct. 210; *United States v. Costello,* 5 Cir., 483 F.2d 1366, 1367; and *see State v. Mendoza,* 109 Ariz. 445, 511 P.2d 627, 630; *People v. Harris,* 213 Cal.App.2d 365, 28 Cal.Rptr. 766, 768." [Emphasis mine]

Consistent with the court's statement in *Dycus, supra,* I suggest that we are here in exactly the situation there described:

Entrapment has occurred " 'when the criminal conduct was "the product of the *creative* activity" of law-enforcement officials.' " The record in this case shows that Janski's conduct was the "product of the *creative* activity" of Laabs.

We have to rely on the record. We can't guess what was going on in anybody's mind. But the record discloses that it was Laabs who introduced the idea of the hashish buy in the mind of Janski and there is no evidence that Janski was predisposed to commit the crime prior to the time when Laabs made the suggestion.

I therefore cannot agree with the petitioner here when it says, at page 2 of its

brief, that when a defendant comes forward after having been asked if he can provide the agent with hashish, and does it,:

"then certainly the Defendant has proved his *readiness to commit the crime, which is the same thing as saying he has exhibited his 'predisposition'."* [Emphasis mine]

Especially do I not agree with the above quoted contention in view of the fact that both parties accepted the court's instruction to the jury on entrapment without objection. That instruction is the law of this case and is not open to review by this court on appeal. *Vinich v. Teton Construction Co.,* Wyo., 518 P.2d 137, 138; *Gifford-Hill Western, Inc. v. Anderson,* Wyo., 496 P.2d 501, 503, and 88 C.J.S. Trial § 425, p. 1151.

The mentioned instruction is set out in its entirety in the majority opinion, but I restate a part of it here so that my position will be clear on "predisposition"—"planning"—"criminal design" and "readiness" to commit the crime. The instruction says, in pertinent part:

"To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent, and the trap for the unwary whose criminal conduct was due to *his own READINESS AND WHO HIMSELF PLANNED TO COMMIT THE CRIME."* [Emphasis mine]

Contrary to the assertion of the appellee —applicant in its brief in support of its rehearing application, *supra,* the above quoted portion of the instruction does *not* say that "readiness" "is the same thing as saying he has exhibited his 'predisposition'." (From the brief of appellee on application for rehearing, page 2 thereof, supra). Nor does the instruction say that "readiness" and "planned" are the same thing.

Under this instruction, "predisposition" means that his criminal conduct must have come about as a result of his "readiness" to commit the crime and additionally there must be a showing that he "planned" to do it because *this is the language of the instruction.* That was the law of this case so far as the jury was concerned, and is the law of the case in the appeal, and is the law now. The instruction does not say "readiness" OR "planned" to commit the crime—it says "readiness" AND *"who himself PLANNED to commit the crime."* [Emphasis mine]

Being of a frame of mind which may be described as being "ready" to commit a crime is not the same thing as having formulated a *"plan"* to commit a crime. The former denotes a passive mental attitude consistent with indifference while the latter implies an element of intention formulated prior to the trap.

The applicant-appellee says at page 2 of its brief in application for rehearing (quoting from its brief in the case in chief):

"The jury found that on his own, Janski himself *planned* to commit the crime." [Emphasis mine]

If that is what the jury found, then, in my opinion, our original decision was correct because there was no evidence of a "plan" to commit the crime on Janski's part and yet, since such a jury finding was an essential element under the instruction, a judgment entered on the verdict, absent proof of planning, was error.

### *"Ready Complacency"*

The State seeks to establish one or more of the following proof requisites of "criminal design," "predisposition," "readiness," or the "planning" required by the instruction, by substituting "ready complacency" on the part of Janski as being proof of the ultimate fact necessary to defeat and overcome the defense of entrapment.[3]

3. By its holding, the majority agrees that this may be done. Mr. Justice McClintock, in his opinion concurring in the affirmance of the conviction says:

" . . . . The testimony of Laabs, however, was to the effect that he merely asked for the drug, the defendant said he would have to go out to get it, did go out, and re-

"Complaisance" (complacence) is defined in the American Heritage Dictionary of the English Language as

"willing compliance to the wishes of others."

"Ready complacency" comes into the philosophy which seeks to overcome the defense of entrapment through a rule which is discussed, among other places, in *United States v. Becker*, 2 Cir., 62 F.2d 1007, 1008, decided in 1933, where that court suggested these excuses for inducement:

". . . . an *existing course of similar criminal conduct*; the accused's already formed design to commit the crime or similar crimes; his willingness to do so, as evinced by *ready complaisance*." [Emphasis mine][4]

"Ready complaisance" used in this context is an evidence tool to show "willingness" as that attitude pertains to

(a) "an existing course of similar criminal conduct" on the part of accused or

(b) "the accused's already formed design to commit the crime or similar crimes."

Ready complaisance is *not*, in my opinion, the ultimate provable fact under the *United States v. Becker* doctrine (or the rule referred to by the majority in 33 A. L.R.2d 886, supra)—it is only a way to establish "willingness" to "commit the crime or similar crimes" or to show "an existing course of similar criminal conduct" in order that the elements of "predisposition"—

"criminal design" or the "planning" spoken of in the instruction may be established to excuse the inducement.

The proof concept of "ready complaisance" comes into focus in a similar way in *United States v. Sherman*, 2 Cir., 200 F.2d 880, 882, where Judge Learned Hand, writing the opinion for the United States Court of Appeals, December 16, 1972, had this to say in speaking to the question of what constitutes a valid reply to the defense of entrapment:

". . . . it is a valid reply to the defence, if the prosecution can satisfy the jury that the accused was ready and willing to commit the offence charged, *WHENEVER THE OPPORTUNITY OFFERED*. In that event the inducement which brought about the actual offence was no more than one instance *of the kind of conduct in which the accused was prepared to engage*; and the prosecution has not seduced an innocent person, but has only provided the means for the accused to realize his *preexisting* purpose. The proof of this may be by evidence of his past offences, of his preparation, even of his 'ready complaisance.'" [Emphasis mine]

Again, "ready complaisance" is a *proof* vehicle for establishing ultimate facts of the accused's being:

"willing to commit the offence charged, whenever the opportunity offered." and

---

turned some 25 to 30 minutes later with two quarter ounces of hashish which were then delivered to him upon payment. "To me this conduct is evidence of 'ready compliance' . . ." (Citing *United States v. Becker*, 2 Cir., 62 F.2d 1007 (1933).

4. Justice Raper, author of the majority opinion, says:
"Without getting into the details of the trilogy . . . . of cases of the Supreme Court of the United States on entrapment, we find a good synopsis of the rules to be gleaned therefrom in Anno., Entrapment—Narcotics Offense, 33 A.L.R.2d 886, § 3: 'The cases within the scope of the annotation support the conclusion that the defense of entrapment cannot be successfully

interposed by one accused of a narcotics offense if he was already engaged in an existing course of similar crimes, . . . . *or* if he had already formed a design to commit the crime with which he was charged, or similar crimes, as where he offered to make a sale prior to any solicitation, *or* was willing to do so, as shown by ready complaisance, *or* if the criminal design originated in the mind of the defendant, and the government, having through its agents reasonable cause to believe that the defendant was violating the narcotics laws, merely afforded opportunities or facilities for the commission of the offense, as by the employment of informers or decoys, the use of decoy letters, or other stratagems. * * *' (Emphasis and footnote supplied.) "

as a way to show a "preexisting purpose" on the part of the accused.

I suggest that, when viewed under the magnifying glass of *Sherman* and *Becker*, supra, and absent a showing of some preparation for the act complained of (i. e., some evidence of an intent to commit the crime)—a similar course of conduct—an already-formed design—a "willingness to commit the offence whenever the opportunity offered," or evidence of some kind of "preexisting purpose,"—"ready complaisance" will not substitute for those required elements of proof.

I disagree with the majority for this reason: We interpret the meaning of "ready complacency" and its roll as an excuse for inducement differently.

I say that a "ready complacency" on the part of the accused may be considered in showing (a) an existing course of similar conduct or (b) the accused's prior-formed design to commit the crime or similar crimes and a willingness to commit this one. While the majority and concurring opinions seem to say that a showing of an attitude of "ready complacency" *unrelated* to proof of (a) an existing course of similar conduct or (b) the accused's prior-formed design to commit this crime or similar crimes is sufficient unto itself to create a jury issue on entrapment.

Mr. Justice McClintock says in his concurring opinion:

"As summarized in the annotation in 33 A.L.R.2d 883, 886, there are several excuses which can be shown to counter the defense of entrapment. One, but only one, of these is to show that defendant has already engaged in an existing course of similar crimes, and other excuses are enumerated in the annotation as alternatives. The fourth one so listed is by showing that the defendant was willing to make the sale and readily complied with the police request, referred to as 'ready compliance.' I find nothing in any of the cases or this annotation that indicates that predisposition can be es-

tablished *only* by a course of criminal conduct or engagement in similar activity so frequently that his participation in this particular event can be said to be part of a criminal pattern. Conceding that such evidence might be more persuasive to the trier of the fact, I am of the opinion that a man who promptly complies with a request to sell drugs may be said to have shown ready compliance. The jury would be entitled to find willingness to make the sale from the fact that defendant was able quickly to contact a source of the drug, make arrangements for payment therefor, secure delivery, and complete the transaction with Laabs in a half hour."

I would relate my difference with the majority to this narrow recognition: I do not believe that the response by the accused to the spring of the trap alone, naked and without further showing of predisposition, intent, or prior plan is excuse for inducement sufficient to constitute a jury question to the defense of entrapment. The majority of the court obviously does.

I would have held, that, there being no proof of predisposition or intent to commit the crime, inducement having been proven, the defense of entrapment was good and defendant's motion for judgment of acquittal and motion to dismiss should have been granted.

## DATE VARIANCE

As a further ground for reversal, the appellant contends that:

"The Court erred in allowing the trial to proceed after the Court discovered that evidence had been received concerning a crime for which the defendant has not been convicted and was not then being tried."

During the trial of this case the witnesses, the court, and counsel became confused on the question of which day the purported illegal sale took place. The 6th of January, 1973, was a Saturday, and the 7th was a Sunday. The buy of hashish was actual-

ly transacted on Saturday, the 6th, while some of the testimony of the witnesses and certain evidence came into the record as though it took place on Sunday, the 7th.

Most of the discussion directed at straightening out the dilemma was outside the presence of the jury, although not all of it as appellee contends and the majority opinion assumes.[5] Examples of testimony and evidence heard and seen by the jury, are the following: Laabs testified that the hash was purchased by Janski on the 7th, but he said on cross-examination that he was not sure whether it was Saturday or Sunday. He said he went to Janski's house on the 7th. In speaking about when he was at Janski's house, he said that other boys in the house were watching TV, and then counsel asked:

"Q This was a Saturday, wasn't it, or was it?

"A I am not sure, it was a Sunday."

The State's witness, Officer Fields, testified that he (Fields) was employed on the 7th by the Casper Police Department; and he responded affirmatively to the following question:

"Q And on or about that date did you have an opportunity to see Mr. Robert Laabs in relation to the purchase of narcotics from Gary Janski?"

Fields also identified State's Exhibit No. 1, tinfoil-wrapped marihuana, which was the purported drug sold by Janski to Laabs, and in so identifying it indicated that the exhibit was received by him from Laabs on "1–6–73." Laabs had testified that he went right to Fields' home after the buy.

There may be much in the contention of the appellant when he says that the jury may well have been unduly prejudiced "concerning the requisite lack of predisposition (referring to the entrapment problem)" and it may, as counsel says, "have influenced the minds of the jurors in reaching their verdict."

I tend to agree that this quandary might well have had a prejudicial effect in the area of entrapment. If, because of all this mix-up as to dates, it is reasonable to assume that the jury received the impression that there was more than one buy and, therefore, a course of criminal conduct was indicated, thereby establishing "predisposition" to commit this crime—the error would indeed have been fatal.

The entrapment feature is, however, the only basis upon which the date variance was prejudicial to the defendant. Otherwise, I am of the opinion that any rights which the defendant might have had because of the date confusion were waived by counsel's refusal to accept the State's offer to continue the case when the problem became apparent.

A continuance would have been the proper relief if it had been necessary. *People v. Cook*, 136 Cal.App.2d 442, 288 P. 2d 602, 606:

"But if appellant had considered such variance of importance, it was his duty to subpoena witnesses with knowledge of his whereabouts on the new day and, if necessary, to ask for a recess of the trial to enable him to prepare his defense against the new day."

To the same effect, see *State v. Christian*, 154 La. 915, 98 So. 418, 419 (1923).

In support of the appellant's contention that the exact date of the crime was material, and proof should have been limited to that particular offense, counsel relies on *Esquibel v. State*, Wyo., 399 P.2d 395 (1965).

*Esquibel*, supra, was a rape case and the defense was an alibi for the date charged

---

5. The majority opinion says: "While there was some confusion as to which case was being tried, there is no indication that the jury received any prejudicial evidence or implications, because the transcript indicates that the matter of confusion if in fact it did exist, was presented to the court alone and outside the hearing of the jury; from what we can see in the transcript, the jury could have been completely oblivious to any mixup. . . ."

in the information. This court, in *Esquibel*, at 399 P.2d, page 399, said:

"There is abundant authority holding that where a defense of alibi is interposed the time of the act of sexual intercourse upon which the State relies for conviction does become material." (Citing cases)

Where, however, the exact date is not critical to the defense, I reiterate what was said in *State v. Koch*, 64 Wyo. 175, 189 P. 2d 162, 166:

". . . . if the transaction relied upon by the state for conviction can be and is identified in a manner other than by stating the exact date that is sufficient." (Citing *State v. Slane*, 48 Wyo. 1, 41 P.2d 269)

The weight of authority supports the proposition that a court must require the state to prove a specific date only when the time element is shown to be essential to the defense. I do not find that the exact date was critical to the defendant's receiving a fair trial and agree with the majority on this point.

## RIGHT OF INQUIRY INTO THE NARCOTICS AGENT'S PRIOR CRIMINAL ACTIVITIES NOT RESULTING IN CONVICTION

It is the contention of appellant that the court erred in denying the defendant the opportunity to inquire of the State's undercover narcotics agent Haystack-Laabs as to his previous activity not resulting in convictions. The court in fact excluded the testimony and, I think, properly so. For the purpose of attacking his credibility, permission was extended to counsel to examine Laabs on matters pertaining to all crimes for which he had in fact been convicted.

We have long followed the general rule which holds that, in testing the credibility of a witness, only evidence of prior conviction is admissible.

In *Eads v. State*, 17 Wyo. 490, 503, 101 P. 946, 950, (1909), defendant attempted to discredit a State's witness by offering to show, for the purpose of affecting his credibility, that he had been arrested for a shooting in a house of prostitution. The evidence proffered was collateral to the issue at hand. We adopted the New York rule, as announced in *People v. Irving*, 95 N.Y. 541, where the New York Court said:

"We have held of late that mere charges or accusations, or even indictments, may not be so inquired into since they are consistent with innocence, and may exist without moral delinquency. (Citing cases from New York courts)"

In support of this rule see also *Jackson v. State*, Wyo., 533 P.2d 1, 4; *Dorador v. State*, Wyo., 520 P.2d 230, 232; *Gabrielson v. State*, Wyo., 510 P.2d 534, 536; *Wright v. State*, Wyo., 446 P.2d 1014, 1016; and *Rosencrance v. State*, 33 Wyo. 370, 239 P. 952, 956.

I would agree with the majority on this question.

## COURT'S REFUSAL TO ALLOW SURREBUTTAL TESTIMONY

Defendant charges error for the court to have denied the defendant the opportunity for surrebuttal after the State had introduced the .22 Derringer pistol and had elicited testimony about the .38 Smith and Wesson for the first time in rebuttal.

There was a gun involved in this case, and whether or not it was a .22 Derringer (without a cylinder) or a .38 caliber Smith and Wesson (with a cylinder) is of serious consequence in the area of witness credibility.

A young boy, seventeen years old, named Kevin Doing, testified for the defense in his case in chief and said that when Haystack asked Janski to get the hash (on the 6th of January) he said:

". . . go get the hash and bring it right back here,"

And:

". . . don't mess around with Haystack."

Doing testified that when these things were said Laabs had a gun pushed into Gary Janski's stomach.

In attempting to describe the gun, Doing remembered it as a gray, Derringer-type pistol, .22, with a white handle. On cross-examination the boy represented that the gun had a cylinder (a Derringer does not have a cylinder). Doing was re-called by the State to identify a certain gun and was handed State's Exhibit 3 for identification, which was a Derringer. He responded to the inquiry as follows:

". . . this isn't the gun I saw [on the 6th of January], the gun had a cylinder right here (indicating), it had a shorter barrel, the cylinder right here, light gray handle." [Bracketed information mine]

It now becomes extremely important to know if Laabs was using or carrying a gun with a cylinder in his undercover work. This is so because if he was his credibility would be suspect since he said he was not carrying or using a gun answering this description on the 6th of January. If he was not carrying the .38 at that time, the integrity of Doing's testimony would be shattered.

In rebuttal, for the first time in the case, on direct examination by the State, Laabs was interrogated about a .38 revolver and he said he carried one only once for approximately five hours about a week after the 6th of January. Officer Fields, his supervisor, verified this.

The State rested rebuttal without offering the .22 Derringer and the court excused the jury. At this junction, counsel for the State announced that he wished to make a motion for the record. The Court said:

"You wish to reopen?

"MR. LEWIS: For the purpose of offering State's Exhibit 3.

"MR. WHITAKER: *And we may want to reopen with* respect to the witnesses with respect to that gun now it is in evidence. It wasn't in evidence, it is another thing if it is in. [Emphasis mine]

"THE COURT: You mean in the morning?

"MR. WHITAKER: Yes, I won't take much time, we are trying to locate this Jim Ford, who was the one at the Mini Mart, the manager of the Mini Marts, and three or four others that he has pulled a gun on. Now, anyway the gun is in evidence and it has been offered, we have something else to rebutt [sic].

"THE COURT: All right, shall we now proceed with the Instructions and in the morning, if you wish to reopen briefly, Mr. Whitaker, you may do so."

The next morning the court asked defense counsel to dictate his request (to reopen) into the record, and, among other things, the request contained these assertions:

Counsel for accused represented to the court that his surrebuttal witnesses were present and ready to testify. He asked permission to reopen since, during the State's rebuttal testimony the day before the .38 Smith and Wesson was shown to the jury for the first time. In addition, counsel requested permission to reopen because the State was permitted to reopen to introduce the .22 caliber Derringer which was admitted into evidence.[6] Counsel indicated that his request to reopen was addressed to his desire to place in the record the testimony of witnesses James Ford and Bill Pierce, from the Mini-Mart of North Casper, and counsel said:

". . . both of whom have seen the Witness Laabs in the possession of a .38 caliber revolver *on a number of occasions.* . . . We are prepared to prove he was in on two separate occasions. . . ." [Emphasis mine]

It should be remembered here that Laabs and Fields both had testified on rebuttal

---

6. All parties and the court treated the matter as though the Derringer was admitted, although the record does not contain a ruling on the offer.

that the only time that Laabs had ever carried a .38 was on one occasion for five hours on a date which apparently fell between the 10th and the 14th of January, 1973.

Defense counsel further offered to prove through the testimony of Ford and Pierce that Laabs used the .38 Smith and Wesson in his undercover activities. Laabs, in rebuttal, had denied the use of this gun in this manner.

In resisting the request of the defense to reopen, the county attorney, addressing the court, said that the State's rebuttal testimony was offered solely for the following purpose:

*"The only thing we offered the gun for was to rebut the testimony of the young man that this Derringer that Laabs was carrying had a cylinder on it, a revolver-type cylinder, as he testified."* [Italics mine]

This is the very reason that it was error to not permit defendant to reopen for the purpose indicated in his counsel's offer, after granting permission to the State to introduce testimony with respect to the .38 caliber gun in *rebuttal* for the first time, and permitting the State to introduce and receive the Derringer after the close of all the testimony. It then became the absolute right of defendant to rebut any *new matter* introduced on rebuttal by the State with respect to these guns and was not for the court to decide in the exercise of its discretion. The offered testimony on the part of defendant would not, in my way of thinking, have been collateral to the principal issues as the court ruled.

The real damage flowing from the court's refusal to hear the testimony of Ford and Pierce might well have been to destroy the credibility of Doing by leaving unimpeached the testimony of the State's principal witnesses, Laabs and Fields, even though the impeaching witnesses for defense were available and even though the defense had not had a prior opportunity to rebut the damaging evidence.

If Laabs had had a .38 on only one occasion for five hours between the 10th and 14th of January, as he and Fields testified, and if, on the other hand, Ford and Pierce would have testified that on:

"a number of occasions"

they had seen Laabs with a .38 Smith and Wesson, this would have been devastating to the credibility of Haystack-Laabs and would have removed the impeaching damage that the State's witnesses rendered to the testimony of Doing.

My main concern is not so much with the question of whether the court *should* have permitted the defendant to reopen since this is within the sound discretion of the court. I am bothered about what I perceive to be error as a matter of law to have refused to permit surrebuttal testimony to counter the rebuttal testimony of Fields and Laabs to the effect that the only time that Laabs carried a pistol with a cylinder was for five hours a week after the 6th of January, 1973.

I cannot agree with Mr. Justice Raper when he says, in writing the majority opinion and speaking about the gun testimony, "The defendant had his opportunity to attack the credibility of the witness Laabs during his own case and passed it up.", citing the following authority:

"As said in *State v. Alexander,* 1958, 78 Wyo. 324, 347, 324 P.2d 831, 839, cert. den. 363 U.S. 850, 80 S.Ct. 1630, 4 L.Ed. 2d 1733, in dealing with the denial of surrebuttal: ' * * * While it is true, as explained by Wigmore, supra, § 1874, pp. 517–518, and 1 Chamberlayne, The Modern Law of Evidence, § 383, pp. 516–517, that new facts brought out on rebuttal may properly be met by surrebuttal evidence, that rule does not permit surrebuttal merely to supply evidence which could have been given in chief or to cumulate additional evidence or to fortify evidence already given, or to supplement such evidence because it has been impeached upon rebuttal. * * * ' "

In my judgment the defendant had no opportunity to impeach the testimony of Laabs and Fields concerning the carrying of the .38 automatic because it was brought out on rebuttal for the first time.

Indeed, Doing testified about guns but the devastating testimony had to do with the assertions of Laabs and Fields that such a gun (with a cylinder) had not been carried by Laabs during the critical period of time pertinent to the alleged crime. This testimony, according to the offer of proof, could have been rebutted and, in my opinion, the court erred in not permitting it.

In VI Wigmore on Evidence, Third Edition, it is said by the author at page 510:

"Everything relevant as a part of the case in chief would naturally have been already put in; and a rebuttal is necessary only because, . . . . new subordinate evidential facts have been offered. . . ." (In the defendant's case the new subordinate facts offered were the ones introduced through the testimony of Doing where he said he saw Laabs use the gun on Janski and that it was a Derringer with a cylinder.)

The eminent writer then says the State had an *absolute right* to put in rebuttal evidence to this testimony—see § 1873, p. 517, sub-paragraph 4:

"For matters *properly not evidential until the rebuttal,* the proponent has a *right* to put them in at that time (i. e., the State's right to cross-examine Doing and to introduce the testimony that the Derringer did not have a cylinder, as well as Laabs' and Fields' testimony that Laabs only had a .38 with cylinder for one day for five hours), *and they are therefore not subject to the discretionary exclusion of the trial Court."* [Parenthetical matters and emphasis mine]

With respect to the "OPPONENT'S CASE IN REJOINDER," § 1874, pp. 517–518, the author says (on the question of Janski's right to respond to true rebuttal testimony):

"For the opponent's case in rejoinder there remain properly only two sorts of evidence, namely, evidence explaining away the effect of *new facts* brought forward by the proponent in rebuttal, and *evidence impeaching the witness* testifying in rebuttal . . . ." [Emphasis mine]

The author goes on to say:

". . . . for evidence legitimately receivable in rejoinder (Janski's proposed evidence of the Mini-Mart people who, under the offer of proof would have testified that Laabs used a .38 in his undercover work on different occasions than the one to which he testified)—*in particular, evidence impeaching rebuttal witnesses*—there has been no prior opportunity to adduce it (and this would be true with respect to the Mini-Mart witnesses since the .38 had not come into evidence until the State introduced it as a part of its rebuttal to the testimony of Doing that the gun he saw pushed into Janski's stomach had a cylinder), and hence it is here entitled to be received, *without depending on the Court's discretion to relax the usual order; for this class of evidence, what has been said in the foregoing section* (§ 1873, para. 4) (supra) *is equally applicable."* [Parenthetical matters and emphasis mine]

For the reasons stated above, I would hold that the refusal of the lower court to permit the introduction of the proffered testimony was prejudicial to the defendant, deprived him of a fair trial, and thus was reversible error.

In summary, I would have held that the defendant was trapped. It was error not to permit the defendant to counter the new matter raised by the State in rebuttal. There was no error in the court's refusing the defendant's counsel the right to inquire into Laabs' criminal charges for which there had been no conviction. The trial court did not commit error in refusing to dismiss the proceedings because of the variance between the date charged in the information as being the date on which the

crime was committed and the dates testified to by certain witnesses and as shown by an exhibit in the record.

I would have denied the petition for rehearing.

GUTHRIE, Chief Justice (dissenting).

I join in the dissent of my Brother Rose. In addition to the authorities cited therein, I would further rely upon the case of *Gray v. State,* 249 Ind. 629, 231 N.E.2d 793, which I view as being completely applicable to this case by virtue of the factual situation therein and which would dictate the disposal made by Justice Rose.